# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JERMAIN ANDERSON,                        Case No. 1:13-cv-755

      Plaintiff,                       Dlott, J.
                                        Bowman, M.J

v.

HAMILTON COUNTY BOARD OF
COMMISSIONERS, *et al.*,

      Defendants.

## REPORT AND RECOMMENDATION

This civil action is before the Court on the Motion to Dismiss and Motion for Summary Judgment by all Defendants in all Capacities Sued (Docs. 78, 79, 80 (SEALED)), and the responsive memoranda and accompanying exhibits (Docs. 82, 83 (SEALED), 84, 85, 86, 89) allowed under the local rules and with leave of Court. Upon careful review of these voluminous materials, the undersigned finds that Defendants' omnibus Motion is well-taken.

## I.    FACTS[1]

### A. Background

Plaintiff Jermain Anderson began her employment with Hamilton County Job and Family Services ("HCJFS")[2] as a "Children's Services Worker" on September 16, 1999.

---

[1] In support of their Motion to Dismiss and Motion for Summary Judgment, Defendants have submitted 21 pages of 113 proposed undisputed facts (Doc. 78-1), along with the declarations of Defendants Christopher Biersack (Doc. 80 (SEALED) at PageID 3520–3608), David Helm (*id.* at PageID 3609–17), Scott Boone (*id.* at PageID 3618–44), Monique Mays (*id.* at PageID 3645–58), Denise Orchard (*id.* at PageID 3659–3703), Deana Coddington (*id.* at PageID 3704–15), and Karen Rumsey (*id.* at PageID 3716–27).

[2] HCJFS was then known as the Hamilton County Department of Human Services. (*See* Doc. 77-2 at PageID 2098.)

(Doc. 77-2 at PageID 2098.)  Anderson received satisfactory probationary and semi-annual performance reviews through June 30, 2003.  (*Id.* at PageID 2100–71.)  The undersigned could not locate in the record a performance review for the period July 1, 2003 through December 31, 2003.  However, the record does include a memo from Anderson to Suzanne Burke and Anderson's supervisor, Jerry Freed, complaining about "hostility and stress" in her working environment, as well as "retaliation" after she returned from a medical leave on January 29, 2004—apparently in the form of a "voo doo" object left in her cubicle by a departing employee.  (*Id.* at PageID 2179.)  In paperwork subsequently faxed to Freed on May 10, 2004, Anderson's internist indicated that Anderson required a leave of absence from May 10, 2004 through August 10, 2004 to seek treatment with psychologist Jacqueline Kinard, at which time "prescription medication may be reintroduced."  (*Id.* at PageID 2181–84.)  Lori Chaney from Human Resources responded, in a telephone call that she memorialized in a letter, advising Anderson that her leave request would exhaust her FMLA hours on July 5, 2004, and, as a result, leave from that date until May 10, 2004 would be considered a disability leave of absence as described in the collective bargaining agreement to which Anderson was subject.[3]  (*Id.* at PageID 2186.)  Anderson's request for leave was retroactively granted on May 17, 2004.  (*Id.* at PageID 2194–95.)  Anderson thereafter filed a complaint with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC") on May 27, 2004, alleging that HCJFS "subjected her to harassment and a hostile working environment, because of her race and in retaliation."  (*Id.* at PageID 2197–2204.)  On July 22, 2004, the OCRC issued its

---

[3] As a Children's Services Worker, Anderson was a member of Local 1768, Ohio Council 1, AFSCME, AFL/CIO and the conditions of her employment at HCJFS was governed by a collective bargaining agreement.  (Biersack Decl., Doc. 80 at PageID 3525 (¶ 13).)

finding that there were "no facts to substantiate that Charging Party [Jermain Anderson] was unlawfully discriminated against because of her race and/or in retaliation." (*Id.*)

Meanwhile, on July 12, 2004, Anderson was evaluated by Medical Director Janet W. Cobb. (*Id.* at PageID 2211.) After review of Anderson's job description and attendance record, and discussion with Anderson's internist, Dr. Cobb opined—in a letter dated August 6, 2004—that Anderson was "not fit to perform the essential functions of the job as a Children's Service Worker on a reliable, predicable [sic] and regular basis." (*Id.*)

On August 10, 2004, Anderson corresponded with Julian Wagner in Human Resources, stating that, on her doctor's advice, she could not return to work "in Jerry[ Freed]'s unit and under Donna[ Lang]'s administration because of the anxiety they cause me." (*Id.* at PageID 2213.) That same day, Labor Relations Manager David Helm sent an email to Freed and Lang, copying Wagner, relaying that he left a message for Anderson that she was not to return to work the next day as scheduled, but, rather, should contact him instead. (*Id.* at 2215.) Anderson and Helm's subsequent conversation was summarized in a letter from him to her dated August 12, 2004. (*Id.* at PageID 2221.) Helm advised Anderson that she needed to request a leave of absence under Article 22.4 of the collective bargaining agreement; failing this, HCJFS would have to proceed with a disability separation. (*Id.*) Anderson indicated that she would request a leave of absence. (*Id.*) The next day Anderson sent Helm a letter in which she declined to give any additional information in support of her leave request. (*Id.* ("I feel that your questions and concerns have been answered. Therefore, I have concluded that the information you [already] received is sufficient.").)

On June 20, 2005, psychologist Dr. Kinard sent a letter stating that Anderson presently "is unable to resume her previous work responsibilities[,]" but she "could return to work with a reduced workload." (*Id.* at PageID 2227.) Kinard followed-up in a handwritten note dated June 30, 2005 with a recommendation that Anderson return to work on July 13, 2005, again qualified by the phrase "with a reduced workload." (*Id.* at PageID 2233.) Lori Chaney from Human Resources asked Anderson to have Dr. Kinard "indicate, in writing, what is meant by 'reduced case load[]'" and to define the duration of the request. (*Id.* at 2235.) Based on the premise that Anderson typically carried a caseload of 25, Kinard clarified that she recommended that Anderson receive only 12 cases, and work only six hours a day for the next six months. (*Id.* at PageID 2237.) Chaney forwarded Kinard's clarification to Moira Weir, HCJFS Director, who, on July 12, 2005, rejected this accommodation:

> We do not hire staff part-time or with restrictions to case load size etc. in Children's Services. In addition, we can not guarantee a 6 hour day in the event an emergency occurs on one of her cases.

(*Id.* at 2231.)

Human Resources Director Larry Mitchell subsequently corresponded with Anderson on May 1, 2006, informing her of several vacant bargaining unit positions "that may now meet the conditions recommended by your doctor." (*Id.* at PageID 2253.) Thirty days later, on May 31, 2006, Mitchell sent Anderson a letter advising that Anderson was being placed on disability separation from her position as Children's Services Worker retroactive to February 6, 2006, having exhausted her disability leave time allowed under the collective bargaining agreement. (*Id.* at PageID 2256.) She also was advised that she could request reinstatement through February 6, 2009. (*Id.*)

Anderson responded on June 6, 2006, appearing to dispute the fact that she exhausted her disability leave time because her medical provider "did submit a statement for which I could return to work on July 13, 2005." (*Id.* at PageID 2261.)

## B. Progressive Discipline Preceding Termination

### 1. October 13, 2011 Written Reprimand

On June 12, 2008, Anderson returned as a Children's Services Worker. (*Id.* at 2263, 2265.) She received a favorable "special" performance review for the balance of 2008 from her supervisor, Catherine Gaines. (*Id.* at PageID 2267–73.) She also received a favorable review from Ms. Gaines for the 2009 evaluation period. (*Id.* at PageID 2275–80.) Anderson's 2010 performance review (dated March 3, 2011) was conducted by Section Chief Denise Orchard,[4] however, because Gaines was out on leave. (*Id.* at PageID 2297.) Orchard noted that "the ratings and comments [we]re primarily based on Ms. Anderson's self evaluation." (*Id.*) The review was largely favorable, save for a magistrate's complaint recorded by Orchard that "Ms. Anderson's court presentation was disorganized and the facts were not clearly articulated." (*Id.* at PageID 2300.) Anderson attributed her unpreparedness to a car accident the evening prior. (*Id.*)

As best the Court can discern, at some point in this time band Bill Abney became Anderson's supervisor. Abney, however, had problems of his own. On July 6, 2010, his supervisor, Section Chief Scott Boone, sent a Pre-Disciplinary Conference Request to Director Weir regarding Abney. (*Id.* at PageID 2282–83.) Boone indicated that Abney had failed to properly supervise a caseworker within his unit with respect to the M.D.

---

[4] Orchard was a Section Chief in the "Ongoing Unit" and supervisors Catherine Gaines, Deana Coddington, and Karen Rumsey were among her direct reports. (Doc. 80 at PageID 3660 (¶ 3).)

family.  (*Id.*)  The subsequent notice to Abney—which accused him of "gross misconduct, neglect of duty, inefficiency, nonfeasance and failure of good behavior"— read as follows:

> On January 21, 2010, your unit was assigned an investigation regarding the M.D. family.  The allegation stated that the parents participated in minimal visitation at the hospital with their infant daughter, who was born three months premature and who was approximately two months old at the time of the referral.  Hospital staff expressed fear for the child's safety and assessed her to be "at high risk for being abused".  The mother was described as being unable to comprehend "the gravity of her daughter's medical needs" and "in need of parent education".  The child's father reportedly refused to allow mother to consult with the various medical professionals responsible for administering and monitoring the child's health care.
>
> The assigned caseworker completed the investigation and submitted the case to you on or around February 8, 2010 with a recommendation to terminate HCJFS involvement.  **You approved the case for closure despite the absence of any attempts on the caseworker's part to visit or observe the child in person and despite knowledge of the child's hospitalization and subsequent discharge.  You also failed to ensure confirmation of the family's participation in services, necessary medical treatment for the child, or any other necessary, supportive mechanisms.**
>
> Your failure to thoughtfully review and evaluate the initial case closure prevented the ability for HCJFS to guide the family toward opportunities which could have avoided the child's continued exposure to unnecessary risk factors.  There is no question that your lack of oversight created potential, yet avoidable, harm to the child.  As a manager, it is your responsibility to carefully and thoroughly review all cases assigned to your team.  You are obligated to affirm paths of comprehensive investigation-gathering as well as diligent assessment.  Your conduct failed to satisfy these standards and does not align with your role as a Supervisor in Children's services.

(*Id.* at PageID 2285 (emphasis added).)  In response, Abney informed Labor Relations Officer Chris Biersack that he was waiving his right to a Pre-Disciplinary Conference

and would abide by the decision of Director Weir. (*Id.* at PageID 2287–88.) Biersack informed Director Weir that it was HCJFS practice, with regard to first-time suspensions for exempt employees, to issue a five- (as opposed to a ten-) day suspension. (*Id.* at PageID 2290–91.) Weir consulted with Boone and imposed a five-day (40 hours) suspension. (*Id.* at PageID 2293–95.)

Less than a year later, on March 21, 2011, Boone sent a second Pre-Disciplinary Conference Request to Weir regarding Abney. (*Id.* at PageID 2313–14.) Three specific instances were cited, among them the T.N. case, where Boone had instructed Abney to refrain from placing any children with a family friend and yet Abney instructed his casework to do just that. (*Id.*) And there was more:

> Additional examples of Mr. Abney's misconduct have been reported in the form [of] employee maltreatment, including him telling one of his staff to "shut up" in the presence of family members as well as other JFS employees. Furthermore, Mr. Abney has failed to efficiently manage his staff, allowing the majority of his team to develop significant articles of backlog. One employee had at least 29 cases open for more than six months at the conclusion of 2010. Review of these cases revealed that the worker failed to make a home visit with the alleged child victim for several consecutive months, if not the entire life of the case.

(*Id.* at PageID 2314.) In response, Abney sought—and was granted—a voluntary demotion from Supervisor to (Children's Services) Worker in lieu of discipline effective April 14, 2011. (*Id.* at PageID 2320, 2324.)

Monique Mays became Anderson's immediate supervisor in April 2011 after Abney was demoted. (Doc. 80 at PageID 3645 (¶ 3).) Shortly *before* the transfer from Abney to Mays as supervisor, Anderson was referred to the Employee Assistance Program by Boone and Human Resources Program Compliance Administrator Carolyn Wallis, because Anderson was "reported to have been sleeping during work hours,

arguing with her supervisor in front of a magistrate, and being confused about clients'

identities when performing background checks." (Doc. 77-2 at PageID 2316.) Anderson

denied sleeping during work hours, but agreed to go to EAP voluntarily. (*Id.* at PageID

2318.) Shortly *after* the transfer from Abney to Mays as supervisor, specifically on April

13, 2011, Mays sent Boone the following email:

> Jermain appears to be going through some type of break down. Several individuals have noticed her to be disheveled and have a flat affect. A co-worker tired [sic] to assist her with visits and then Jermain gave the [guardian ad litem] the co-workers [sic] number like she was passing the case on. She's [sic] needs a lot of help with case plan [sic] and navigating through SACWIS. We can discuss further when you get back in the office.

(*Id.* at PageID 2326.) A week later,[5] Boone contacted Wallis, seeking her "assistance

regarding a mandatory ADA referral and/or assessment for Ms. Anderson." (*Id.* at

PageID 2328.) Wallis suggested to Boone that this behavior required "corrective action"

rather than any sort of accommodation. (Doc. 77-3 at PageID 2343.) Nothing occurred

in the immediate aftermath of this email exchange. A few months later, on August 4,

2011, Boone forwarded to Wallis an email Mays received from a Semi-Annual Review

("SAR")[6] facilitator who listed out nine very specific deficiencies in Anderson's

presentation with regard to the Y.D. case.[7] The facilitator began by saying, "I do not

---

[5] Boone's letter to Wallis bears the date April 20, 2010, but it is apparent from the body of the letter that it was drafted and sent in 2011. (*See also* Boone Decl., Doc. 80 at PageID 3631 (¶ 37); Wallis Decl., Doc. 78-9 at PageID 3505–06 (¶ 10).)

[6] Semi-annual reviews are required by Ohio law. (Anderson Dep., Doc. 76 at PageID 475–76 (27:23–28:6).)

[7] The facilitator wrote:

> For example, 1.) The worker reported that the father was arrested in May for possession of a crack pipe, but could not explain why this has not been addressed any further through case plan services. 2.) She was unable to articulate the behaviors that warranted mental health services for the children, or their diagnosis without shuffling through papers to read it from the diagnostic assessment. 3.) She stated that she thinks that she filed the most recent case plan in court, but could not be certain because she never got it back from the prosecutor's office. 4.) She was unable to explain the outcome of the father's sex offender's assessment in terms of his risk to re-

want to overstep my boundaries[,]" and ended with "I hope that this information will be useful to you in the supervision of this case." (Doc. 76-1 at PageID 934.) Wallis' take on the incident was the same as before: "As [the ADA committee] concluded previously, the stated observations deserve more attention from a standpoint of a *Supervision* session or through the disciplinary process. The stated observations do not lend themselves to any obvious mental health condition." (*Id.* at PageID 935 (emphasis in original).)

That discipline came on October 13, 2011, when Boone issued a Written Reprimand to Anderson. (Doc. 77-2 at 2337.) It read as follows:

> On 08/15/11, you did not sign in or out for the work day. When I called you, you did not answer your agency cell phone. On 08/16/11, you signed in for the previous day and noted that you worked from 9am to 11am. When I asked you about your work day, you stated you had an emergency and left without notifying me. You stated you were at a visit. However, you have not been able to produce a visitation receipt or any other materials for that contact despite my requests.
>
> Regarding the T.N. family, you received specific instruction from Section Chief Boone to avoid placement of any of the children with a particular family friend. Instead, you facilitated placement with the friend and failed to perform the appropriate background checks related to that individual. It has been reported to Section Chief Boone that you revealed confidential information regarding another adult with this person without permission or consent. It was also disclosed that you initially failed to arrange contact between the

---

offend, and why he had not engaged in anger management treatment per the recommendation from that assessment. 5.) She stated in the SAR that she had tried to contact the father's payee about payment for the anger management service, which indicates that he is receiving income for a disability and is unable to manage his own funds. This would suggest a mental health or cognitive impairment that has not been addressed in the case plan. 6.) She could not articulate efforts to ensure that the siblings that are placed separately have visits with each other. 7.) She was not sure whether or not the agency has already filed a motion for permanent custody. 8.) There are children from a different mother co-mingled into the members of this family in SACWIS. Ms. Anderson was aware of this in January, 2011 from the last SAR, but it remains unresolved. 9.) The father is engaging in parenting classes but it is not addressed anywhere in the case plan.

(Doc. 76-1 at PageID 934.)

mother and the children, prompting Juvenile Court to advise the Prosecutor that the agency was in danger of being held in contempt due to failing to follow through with Court-ordered visitation. The foster care network stated that you failed to complete the necessary paperwork, jeopardizing the placement arrangements for each of the children. Finally, the network shared that you failed to secure psychotropic and related preventative medications for two of the children, creating a significant gap in their respective pharmaceutical regimens.

There have been complaints by staff, service providers, consumers and Court officials stating that you are not prepared for home visits, meetings, and court hearings. The reports indicate that you are largely unable to articulate the facts or activities of your cases. You have also given inaccurate and misleading information to service providers regarding your job responsibilities and informed them that it is not your job to transport consumers assigned to your caseload to meetings or other relevant events.

Most recently, you failed to file Juvenile Court reports regarding the S.P. family through the designated channels on 9/9/11. Further, you attached a confidential mental health report and psychiatric assessment regarding a child associated with a separate case with no relationship or relevance to S.P.

Your actions violate CSM Section 13.3, sections 6.1 of the policy and procedure manual and constitute gross misconduct, absence without leave, inefficiency, nonfeasance, neglect of duty and failure of good behavior as defined in Article 7 of our labor agreement.

(*Id.*) Chief Union Steward Erica Binford[8] filed a grievance on Anderson's behalf regarding this Written Reprimand, which prompted a Peer Review Hearing held on December 21, 2011. (Doc. 77-3 at PageID 2341, 2346, 2348.) At the hearing before three panel members—one from management and two from the bargaining unit—Anderson was represented by Binford. Both sides introduced exhibits, a number of which overlapped. (*Id.* at PageID 2353–495 (Anderson), 2496–592 (HCJFS).) The panel found that Boone had just cause to issue the Written Reprimand and concluded that it should be enforced. (*Id.* at PageID 2350–52.)

---

[8] Like Anderson, Binford was a Children's Services Worker. (Doc. 76 (77:2–6).)

## 2. February 11, 2013 Suspension (80 Hours Without Pay)

Mays remained Anderson's supervisor until the panel released its decision in early January 2012. (Mays Decl., Doc. 80 at PageID 3645–46 (¶ 3).) At that time Anderson requested to transfer back to the supervision of Catherine Gaines—who still reported to Denise Orchard—and her request was granted. (*Id.*) Gaines received an email from Gaja Karyala regarding Anderson on July 6, 2012. (Doc. 77-4 at PageID 2654.) She complained that Anderson was not prepared for two SARs scheduled for the day before. (*Id.*) One had to be rescheduled because Anderson had not timely notified the parties. (*Id.*) As to the second:

> She did not have all the documentation required for the SAR. She had printed the med/ed form from SACWIS which were all blank forms. No dentals. Photos did not meet requirements. Did not know when the last [home visit] was done. There were two court hearings since the last SAR but no court entries. I understand that you/Denise and Melissa had tried to find the court entry in JCMS and were unable to locate it. She did not seem to have a grasp of what happens in a SAR. Appeared to have some difficulty understanding the process. I thought you should know.

(*Id.*)

Gaines, like Abney, also had problems of her own. On April 6, 2012, Orchard emailed Chris Biersack in Human Resources to discuss an appropriate course of discipline. (Doc. 77-3 at PageID 2624.) Attached to her email was a memo outlining "multiple gaps in [Gaines'] management of cases and follow through with holding staff accountable in their assessment of safety." (*Id.* at PageID 2625–26.) Biersack recommended a Written Reprimand, noting that Gaines had no prior discipline in her personnel file, and a Performance Improvement Plan ("PIP"). (Doc. 77-4 at PageID 2628.) Orchard agreed with providing Gaines a PIP, but believed a "higher level" of

discipline—a Pre-Disciplinary Conference—was warranted. (*Id.* ("It appeared each case I rev'd had the same themes of not inserting herself as a manager to make decisions.").) In response, Gaines asked if she could waive the waive the hearing:

> This is my first incident of being written up and any form of discipline as a worker or manager my 12 years here at the agency. I have never even been put on a corrective action plan or received a verbal warning. I have received at least an overall achieved on every evaluation as a worker as well as a manager.
>
> . . . .
>
> I was out on medical leave for almost seven months. I returned to work in 6/11. It was difficult when I returned just to get adjusted working full days again. I came back and was immediately assigned five workers with full case loads. At first it was difficult to plan my days while trying to learn all the cases and provide the amount of supervision needed for all my staff. **Don't get me wrong, there is no excuse for the outlined allegations of misconduct presented by my manager**. I will be a better manager and perform my job duties to the greatest expectations of the agency. I hope that we can agree upon a discipline where I don't have to have a hearing. I want to waive my hearing, but I would like to know what the agency is proposing as a form of discipline. I would hope the minimal degree of discipline would be given. . . .

(*Id.* at PageID 2641 (emphasis added).) Orchard and Director Weir agreed to waiver and a five-day suspension. (*Id.* at PageID 2640, 2643.) Gaines was found guilty of "gross misconduct, neglect of duty, inefficiency, nonfeasance, and failure of good behavior." (*Id.* at PageID 2645–46.)

Gaines took another medical leave beginning July 12, 2012, and Deana Coddington, another one of Orchard's direct reports, became Anderson's supervisor. (Coddington Decl., Doc. 80 at PageID 3704 (¶ 3), 3705 (¶ 5).) Gaines did not tell

Coddington about the July 6 email from Gaja Karyala.  (*Id.* (¶ 6).)[9]  Testifying generally

about her experience supervising Anderson, Coddington stated:

> [W]hen she verbally reported to me concerning her cases I found it
> difficult to follow her thinking and processing of information.  I do
> remember having difficulty scheduling formal supervision sessions
> with Ms. Anderson so that I could become more aware of her cases
> in order to more effectively provide support as her manager.  I
> remember Ms. Anderson not being as available for this purpose as
> I would have preferred or expected.

(*Id.*)   Coddington relayed more specifically, however, that, during a September 21,

2012 supervision meeting, Anderson "exhibited a poor attitude" when she was told she

was being assigned an additional case because her caseload was lower than others in

their unit.  (*Id.* (¶ 8).)   Anderson, in turn, informed Coddington that her doctor had

recommended a lower caseload and she questioned why Coddington did not have

"paperwork reflecting her disability."  (Doc. 76-3 at PageID 1249.)  This discussion was

the first time that Coddington "had any awareness" that Anderson had spoken to Human

Resources concerning any "limitation" she had in performing her job.  (Doc. 80 at

PageID 3705–06 (¶ 8).)   She instructed Anderson to follow-up with Program

Compliance Administrator Carolyn Wallis, and then emailed her supervisor, Denise

Orchard, about their meeting.  (Doc. 76-3 at PageID 1249.)

---

[9] While Gaines was on leave, Orchard again discovered "significant" case practice gaps "through review of the PIP, individual case reviews of cases in her section, and feedback from other supervisors of cases transferred to them."  (*Id.* at PageID 2656–62.)  Orchard requested a Pre-Disciplinary Conference, which was scheduled for September 25, 2012.  (*Id.* at PageID 2666, 2668–69.)  Because Gaines went on an extended medical leave, that Conference was not held until March 1, 2013.  (Doc. 77-6 at PageID 3149–50.)  Gaines offered no exhibits in her defense, and testified that "overall what the agency submitted as evidence is true."  (*Id.* at PageID 3160.)  The neutral hearing officer found that "the agency presented evidence on 22 different family cases where not only was the agency put at risk, but children were put at risk. . . . It was also shown that the agency incurred financial losses due to the fact that Ms. Gaines failed to properly review the mileage vouchers submitted by one of her direct reports."  (*Id.* at PageID 3161.)  Gaines was removed from her position effective March 21, 2013.  *(Id.* at PageID 3169–71.)

An August 27, 2012 letter confirms that Anderson met with Wallis in late August. (Doc. 76-3 at PageID 1245.)  Wallis advised Anderson:

> Hamilton County considers your request for a reduced caseload to be a request for an accommodation under the [Americans with Disabilities Act].  Hamilton County does not consider you disabled. Nevertheless, if you consider yourself to be an individual with a disability, Hamilton County will need additional information relating to your medical condition to properly consider your request.

(*Id.*)  Wallis enclosed the necessary form for Anderson to sign, and paperwork for her physician to complete, and asked that the documentation be submitted within two weeks.  (*Id.*)  This documentation eventually was received on October 3, 2012.  (*Id.* at PageID 1260–67.)

Wallis responded to both Orchard and Coddington on September 24, 2012 regarding Coddington's September 21 meeting with Anderson:

> Ms. Anderson and I had a similar conversation as to her *needing* a reduced caseload.  That conversation resulted in me giving Ms. Anderson an Americans With Disabilities (ADA) packet. Technically, she was to have the completed medical documentation back to me around September 10.
>
> She came to me sometime last week to check on the status and I informed her that I have not received anything yet. And, until we receive something, the ADA committee has nothing to review or consider.  **In the meantime, please keep documenting your interactions with her (good and bad) and treat her no differently than any other employee in your section.**
>
> There were restrictions connected with her approved FMLA, #12-10017a.  The physician indicated that she is not to lift more than 5 pounds or engage in activities that require prolonged sitting or standing.  She and (sic) discussed these restrictions and Ms. Anderson indicated that she would be able to work within those restrictions.  However, that FMLA claim expired on July 31 and I have not received any request or information about extending it.

(*Id.* (first emphasis in original, second emphasis added).)   On September 28, 2012, Orchard emailed Biersack, asking to set up a meeting to discuss discipline.  (*Id.* at PageID 1253.)  She attached a six-page spreadsheet that detailed Anderson's deficient job performance regarding 11 different cases.  (*Id.* at PageID 1254–59.)  Biersack notified Anderson that a meeting had been scheduled for October 9, 2012, because her managers were "contemplating taking disciplinary action" against her "for a variety of performance issues, including:  poor communication, lacking understanding of your cases and, what has been described as, an overall confusion on your part." (*Id.* at PageID 1268.)   Chief Union Steward Erica Binford was copied on the email, and Biersack advised Anderson to bring Binford with her to the meeting.  (*Id.*)   At the meeting the scenarios referenced in the spreadsheet were discussed.   According to Coddington, Anderson "was not able to offer us an adequate explanation concerning any of the complaints that had been made or any of the lapses in judgment that had been identified."  (Doc. 80 at PageID 3712 (¶ 23).)  In her defense, Anderson "simply offered the excuse that she had several different supervisors and too many cases."  (*Id.*) Because Anderson "would not take responsibility for the errors, oversights and failures to follow court orders, supervisor directives and agency policy[,]" Coddington and Biersack determined to proceed with formal discipline.  (*Id.* at PageID 3713 (¶ 26).)  To that end, on October 12, 2012, Biersack sent to Anderson a Notice of Pre-Disciplinary Conference for November 8, 2012, advising her that her actions—summarized as follows—constituted "gross misconduct, neglect of duty, nonfeasance, inefficiency and failure of good behavior" under Section 7.3 of the collective bargaining agreement:

> Despite repeated counseling and discipline, including a written
> reprimand issued to you on 10/13/11, you continue to have

performance problems. Specifically, your manager has received more than a dozen different complaints from consumers, court officials, service providers and other HCJFS staff regarding your poor communication with them, your apparent lack of understanding of your own cases and an overall confusion on your part with regard to what is going on. Included in these complaints are clients who claim that they have been unable to obtain clear information from you regarding the direction of their cases and HCJFS staff who have witnessed your behavior in court and SAR's and described you as not being prepared and not having a grasp of what was happening. In addition to that, on multiple occasions, your statements regarding your cases, either at a hearing or to your manager, contradict what your case notes show. Finally, on several of your cases, home visits have not been made to assess the safety and wellbeing of the children on them.

(*Id.* at PageID 1270.) The same day, Biersack emailed Coddington and Orchard, explaining that he was working with Chief Union Steward Binford "to impress upon Ms. Anderson the benefit of obtaining an ADA request for demotion to an [Eligibility Technician] position." (*Id.* at PageID 1271.) He timed issuance of the Notice such that the "force and effect of Ms. Anderson's 2011 Written Reprimand"—due to expire the next day—might provide the impetus, and indicated that, if Anderson chose demotion, "we can withdraw the Pre-D." (*Id.*) Meanwhile, on October 15, 2012, Wallis advised Anderson that her request for a "reduced case load" of 12-15 (instead of 22) cases could not be accommodated. (*Id.* at PageID 1272 ("Unfortunately, reducing your caseload would essentially increase the caseloads of other workers which we cannot do. For a Family Services Worker position this type of request cannot be accommodated.").) Wallis further advised Anderson that she would be accommodated "if [she] met the minimum qualifications of any existing vacancy in the agency." (*Id.*)

Karen Rumsey assumed supervision of Anderson in the fall of 2012 when Deana Coddington took a maternity leave.[10]  (*Id.* at PageID 3714 (¶ 28); Rumsey Decl., Doc. 80 at PageID 3717 (¶¶ 3, 5).)[11]  Anderson received advice from Labor Relations Officer Diane Davis on November 7, 2012 that her Pre-Disciplinary Hearing set for the next day was postponed, continued at the request of Chief Union Steward Binford.  (*See* Doc. 76-3 at PageID 1275, 1290.)  On November 15, 2012, Anderson left Rumsey a voice mail message that her doctor was putting her on "bed rest" until November 26, 2012.  (*Id.* at PageID 1276.)  On November 20, 2012, Anderson filed a Charge of Discrimination with the EEOC, alleging age and disability discrimination and retaliation:

> I am 57 years-old and I have a disability.  After I requested reasonable accommodation on October 5, 2012, I was called to a pre-discipline hearing on October 8, 2012 as retaliation for engaging in a protected activity.  I was also denied the requested reasonable accommodation request.  I also believe I am being denied the same tools for performing the job as younger individuals.

(*Id.* at PageID 1278–79.)  Anderson's Pre-Disciplinary Conference was rescheduled to December 10, 2012, and then postponed that morning because of the "illness and absence" of Diane Davis, who would serve as the employer representative.  (*See id.* at PageID 1289, 1295, 1297–98.)  Thereafter, on December 31, 2012, the Conference was set for January 10, 2013, with the added charge that Anderson failed to show up for work on December 26, 2012.  (*Id.* at PageID 1297, 1299.)  As before, Anderson was represented by Chief Union Steward Erica Binford.  (Doc. 77-5 at PageID 2753.)

---

[10] Coddington returned from maternity leave in February 2013.  (Doc. 80 at PageID 3714 (¶ 29).)  She did not resume supervision of Anderson and "had no involvement" in Anderson's termination from HCJFS.  (*Id.* (¶¶ 29, 30).)  Coddington testified that she "had no knowledge that Ms. Anderson filed any complaints with the Equal Employment Opportunity Commission[,] and became aware of those complaints only during the pendency of this civil action."  (*Id.* (¶ 31).)

[11] As discussed *infra*, Rumsey remained Anderson's immediate supervisor until Anderson's termination in July of 2013.

HCJFS introduced more than 350 pages of exhibits. (*See id.* at PageID 2768–3138.) The Hearing Administrator ultimately found that the numerous allegations of misconduct brought against Anderson were valid. (*Id.* at PageID 2753–64.) On February 11, 2013, Anderson was suspended without pay for 80 hours.[12] (Doc. 77-6 at PageID 3143–44.)

HCJFS responded to Anderson's November 20, 2012 Charge of Discrimination on January 2, 2013. (Doc. 76-3 at PageID 1300–07.) Anderson amended her Charge of Discrimination with the EEOC on March 13, 2013 to include discrimination based on race. (Doc. 77-6 at PageID 3152–53.) On March 27, 2013, the EEOC issued to Anderson a right-to-sue notice, determining that it was "unable to conclude that the information obtained establishes violations of the statutes." (*Id.* at PageID 3173.)

### 3. July 23, 2013 Removal

On May 2, 2013, Program Compliance Administrator Wallis met again with Anderson. (*Id.* at PageID 3175.) Chief Union Steward Binford attended the meeting as well. (Wallis Decl., Doc. 78-9 at PageID 3511 (¶ 29).) Anderson reprised her assertion that she was entitled to a reduced caseload as an accommodation for her disability. Wallis testified:

> I reiterated to her that a reduced caseload was not an appropriate accommodation because carrying a full caseload was an essential function of the job of a Children's Services Worker. I explained to Ms. Anderson that her request for a reduced caseload had been reviewed, denied and could not be processed again. Ms. Binford actively participated in the meeting in trying to help Ms. Anderson's (sic) comprehend that a reduced caseload was an inappropriate accommodation request for Ms. Anderson in her role as a caseworker.

---

[12] The Union did not pursue this suspension to arbitration under the collective bargaining agreement. (Biersack Decl., Doc. 80 at PageID 3548 (¶ 70).)

(*Id.* at PageID 3511–12 (¶ 29).) The conversation then shifted to whether Anderson might qualify for a different accommodation based on her physical limitations. To this end, Wallis gave Anderson two sets of FMLA paperwork to give to her medical providers. (*Id.* at PageID 3512 (¶ 29).)[13]

A second Pre-Disciplinary Conference regarding Anderson was scheduled for June 21, 2013, and then rescheduled to July 1, 2013 at the request of Chief Union Steward Binford. (Doc. 77-6 at PageID 3194–95.) Anderson was accused as follows:

> Despite repeated counseling and discipline, including a 10-day suspension served February 14 – 27, 2013, you continue to have performance problems. Specifically, your manager has received several complaints from consumers, court officials, and service providers regarding your poor communication with them; your apparent lack of understanding of your own cases; and an overall confusion on your part with regard to what is going on. Included in these complaints are clients who claim that they have been unable to obtain clear information from you regarding the direction of their cases; court orders not being followed; and display of poor judgment on your part regarding case management decisions.

(*Id.* at PageID 3195.) Once again, Binford represented Anderson at the conference. (*Id.* at PageID 3197.) The neutral hearing officer issued an 11-page report, thoroughly detailing the presentations by agency and employee, and making clear that it did not concern "matters previously treated" but instead was "concerned solely with the behaviors of the employee in question following the prior imposition of disciplinary action (specifically, the ten-day suspension)." (*Id.* at PageID 3197–207.) HCJFS presented a list of six cases in which Anderson was deficient in her performance. (*Id.* at

---

[13] On June 13, 2013, Wallis received return paperwork from Ferhan Asghar, M.D. Dr. Asghar noted that Anderson was not disabled, but suggested that she not lift anything greater than 30 pounds, take frequent breaks from sitting, and have her work station ergonomically evaluated. (Doc. 77-6 at PageID 3186–88.) Wallis received no other ADA paperwork prior to Anderson's removal. (Doc. 78-9 at PageID 3512 (¶ 30).)

PageID 3197.) In one of these cases, the hearing officer noted that a Hamilton County

Magistrate memorialized Anderson's failings in a docketed order:

> The text of the Decision as drafted by the Magistrate is highly critical of the worker's actions in the referenced case. The Magistrate repeatedly notes that the worker was unprepared for Hearing of the matter, seemed unfamiliar with the details of the case, failed to provide a report as expected by the Court and failed to assist parties in engaging in Court-Ordered services. The Magistrate further notes that the worker had been Ordered by the Court to provide DNA testing results some three months prior and had failed to do so by the date of Hearing.

(*Id.* at PageID 3198.) In another, a service provider left a voicemail for Karen Rumsey,

Anderson's supervisor, concerning Anderson's behavior. Anderson's response was to

email the service provider and complain that she complained. (*Id.* at PageID 3198,

3230 ("I don't understand why you left my supervisor a supervisor [sic] complaining

about things not working out with me.").) Other excerpts from the report are reprinted

below:

> The assertions made by Ms. Anderson regarding being subject to an improperly heightened level of scrutiny by supervisory staff are deemed not well-taken. **By all accounts (including her own admission), the employee struggled to meet job expectations and was unable to keep up with job duties at the level of her peers (as evidenced by her reduced caseload as compared to fellow staff). In situations such as this, the supervisor would be remiss in not reviewing the work of the employee in question with additional scrutiny**; in fact, the supervisor would be negligent in her own job performance if she failed to keep a close eye on the work product of this particular employee.
>
> The allegations of Ms. Anderson regarding concerted supervisory effort to retaliate against her are likewise deemed not well-taken. **There is nothing in the record that indicates that Ms. Anderson has been subject to managerial retaliation (aside from her naked assertion of same).** . . . As to her being subject to supervision by various managers (i.e. "managerial musical chairs"), this appears to be the result of unfortunate timing rather than a diabolical plan involving the employee.

The allegations of Ms. Anderson that the incidents being recounted at Hearing of this matter were common to all caseworkers are likewise deemed not well-taken. **While it may be acknowledged that certain Magistrates may have a negative predisposition towards certain caseworkers, they rarely take the time and effort to journalize the perceived shortcomings of caseworkers by way of Court Entry.** The failures on the part of the staff member to comply with Court expectations (and direct Court Order) were of such magnitude that this Magistrate felt it necessary to document said failures by way of filed Entry.

. . . .

Ms. Anderson's assertions that the all (sic) members of the Agency (presumably including herself) were "going through a challenging period" leading to shortfalls in work product are likewise not well-taken. **As previously noted, the scope of this Hearing was for work deficiencies exhibited by the staff member following her return from suspension in late February, 2013.** This was after the e-mail sent by Director Weir on 02/27/2012, after the Enquirer article was published on 08/20/2012, after the e-mail sent by Director Weir on 08/31/2012, after caseworkers were provided with the iPads referenced in the Enquirer article and **after the worker in question was provided with a reduced caseload to allow her the opportunity to more effectively work her cases.**

Particularly troubling were the comments made at Conference alleging that the shortfalls of this worker over the past four months were somehow related to the prior fatalities of children in Agency care; **for the worker to attempt to excuse recent substandard employee performance by "wrapping herself in the cloak of Marcus Feisel" is, in a word, inexcusable.** The co-workers of this staff member were not only managing to stay abreast of their workload; they were managing to do so while absorbing additional work that would have normally been assigned to this worker. . . .

(*Id.* at PageID 3206 (emphasis added).)

In light of the findings within the report coupled with Anderson's previous ten-day suspension, Section Chief Denise Orchard recommended to Director Moira Weir that Anderson be terminated. (*Id.* at PageID 3237.) Weir agreed, and Anderson was

removed from the position of Children's Services Worker effective July 23, 2013.[14] (*Id.* at PageID 3239–40.) Anderson filed a Charge of Discrimination with the EEOC the following day, alleging discrimination based on race, age, and disability as well as retaliation. (*Id.* at PageID 3242–43.) On April 1, 2013, the EEOC issued to Anderson a right-to-sue notice, again determining that it was "unable to conclude that the information obtained establishes violations of the statutes." (*Id.* at PageID 3245.)

### C. Procedural Posture

The original *pro se* Complaint in this civil action was filed November 12, 2013. (Doc. 5.) Thereafter, on January 12, 2014 attorney John H. Forg, III filed a Notice of Appearance and, days later, successfully sought leave of Court to file an Amended Complaint on behalf of his client. (Docs. 10–13.) The Amended Complaint alleges age discrimination in violation of federal law (Count One) and retaliation for filing a charge of discrimination with the EEOC in violation of federal (Count Two) and state (Count Three) law. (Doc. 14.) The body of the Amended Complaint names the Hamilton County Board of Commissioners and individuals Bill Abney, Chris Biersack, Scott Boone, Deana Coddington, Cheryl Keller, Monique Mays, Denise Orchard, Karen Ramsy,[15] and Moira Weir as Defendants. (*Id.* at PageID 63–64 (¶¶ 2, 3).) [16] At attorney Forg's request, the case was dismissed without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) in an Order docketed on October 1, 2014. (Docs. 24, 25.) Plaintiff moved to reopen, once again proceeding *pro se*, on July 16, 2015. (Doc. 26.) The presiding

---

[14] The Union did not pursue Anderson's removal to arbitration under the collective bargaining agreement. (Biersack Decl., Doc. 80 at PageID 3548 (¶ 71).)

[15] Plaintiff short cites Defendant Ramsy's name as "Ramsey." (*See* Doc. 14 at PageID 63 (¶ 3).) Apparently the correct spelling of her surname, however, is "Rumsey." (Rumsey Decl., Doc. 80 at PageID 197–208.)

[16] In contrast, however, the caption of the Amended Complaint lists Hamilton County Board of Commissioners as the single Defendant. (*See* Doc. 14 at PageID 63.)

district judge granted her motion by Notation Order docketed on July 24, 2015.  (Doc. 28.)  With Court approval, Defendant Cheryl Keller was dismissed from the case on November 17, 2015.  (Docs. 35, 36.)  Defendants filed a Suggestion of the Death of Defendant Bill Abney on September 29, 2016.  (Doc. 51.)

The instant omnibus Motion was filed on September 29, 2017.  (Doc. 78.)  No response was filed by Plaintiff, prompting the undersigned to issue an Order to Show Cause on November 1, 2017 as to why Defendants' Motion should not be construed as unopposed and granted for the reasons stated.  (*See* Doc. 81.)  Plaintiff timely complied, filing her Memorandum in Opposition on November 22, 2017.  (Doc. 82.)  Defendants reply followed on December 4, 2017.  (Doc. 84.)  Plaintiff then filed a second Memorandum in Opposition on December 22, 2017 (Doc. 86), which Defendants moved to strike as improper under the local rules (Doc. 87).  The undersigned granted Defendants' alternative motion for leave to reply to Plaintiff's second memorandum, with the instruction that no further briefing from the parties would be permitted.  (01/05/2018 Notation Order.)  With the filing of Defendants' Reply to Plaintiff's Second Memorandum (Doc. 89), this matter became ripe for review by the undersigned for report and recommendation to the presiding district judge.

## II.    STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled.  First, "a party seeking

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 331–32. As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,]will not be counted." *Id.* Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th

Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, a court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

### A. Defendants' Motion to Dismiss

Plaintiff has sued not only the Hamilton County Board of Commissioners, but also nine HCJFS employees (both current and former) in their individual and "agency" capacities. (*See* Doc. 14 at PageID 63–64 (¶ 3).) They ask to be dismissed as individuals from this civil action, maintaining that they cannot be held personally liable for violations of the Age Discrimination in Employment Act ("ADEA"),[17] or for retaliation

---

[17] 29 U.S.C. § 621 *et seq.*

in violation Title VII of the Civil Rights Act of 1964 ("Title VII")[18] and the Americans with Disabilities Act ("ADA")[19]. Defendants are correct. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997) ("[W]e find that the statute as a whole, the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VI.").[20] *See Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999) (applying *Wathen*, "Title VII expressly forecloses a right of action against supervisors, in their individual capacities, for retaliation under the Rehabilitation Act[, 29 U.S.C. §§ 701–794a]"); *Liggins v. State of Ohio*, No. 99-3535, 2000 WL 178420, at *2 (6th Cir. Feb. 8, 2000) (affirming the district court's dismissal of the plaintiff's Title VII and ADEA claims against the individual defendants sued, citing *Wathen*: "The named defendants, sued in their individual capacities, are not included within the statutory definition of 'employer' under Title VII **and its sister civil rights statutes**, and accordingly cannot be held personally liable for discrimination.") (emphasis added); *Strong v. HMA Fentress Cnty. Gen. Hosp., LLC*, 194 F. Supp. 3d 685, 687 (M.D. Tenn. 2016) (quoting *Wathen*, "[A]n individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII").[21] Defendants are also correct that they cannot be held personally liable for Plaintiff's state law retaliation claim. *Hauser v. Dayton Police Dep't*, 140 Ohio St. 3d 268, 2014-Ohio-3636, 17 N.E.3d 554, at ¶ 1 ("We conclude that the employment-discrimination provisions in R.C. 4112.01(A)(2) and 4112.02(A) do not expressly impose

---

[18] 42 U.S.C. § 2000e *et seq.*

[19] 42 U.S.C. § 12201 *et seq.*

[20] For an updated discussion of *Wathen*, the undersigned refers the reader to *Pettinato v. Prof. Parent Care*, No. 16-cv-14419, 2017 WL 2930915 (E.D. Mich. July 10, 2017).

[21] *See generally Mitchell v. Chapman*, 343 F.3d 811, 825–33 (6th Cir. 2003) (Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654, does not impose individual liability on public agency employers).

civil liability on [political subdivision] employees, but instead impose vicarious liability on the political subdivision itself."). Thus, the individual Defendants are properly dismissed from this civil action. [22]

## B. Defendants' Motion for Summary Judgment

It bears repeating that the Amended Complaint—filed when Plaintiff was represented by counsel—alleges *only* three claims: age discrimination in violation of federal law (Count One) and retaliation for filing a charge of discrimination with the EEOC in violation of federal (Count Two) and state (Count Three) law. Those sections of Plaintiff's memoranda in opposition that discuss assertions of race discrimination or a failure to accommodate under the ADA, therefore, are irrelevant and properly disregarded by the undersigned.

### 1. Remaining Defendant Hamilton County Board of Commissioners is Entitled to Judgment as a Matter of Law with Respect to Plaintiff's Federal Claim of Age Discrimination (Count One)

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to take adverse action against an employee "**because of** such individual's age." 29 U.S.C. § 623(a) (emphasis added). "A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). With both direct and circumstantial evidence, "the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the "but-for" cause of their employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009)). "[I]t is not sufficient for the plaintiff to show that age was **a** motivating

---

[22] A second reason supports dismissal of individual Defendant Bill Abney. As earlier recited, Defendants filed a suggestion of death with respect to Abney on September 29, 2016. (Doc. 51.) No motion for substitution was made by any party, Plaintiff included. Accordingly, pursuant to Fed. R. Civ. P. 25(a)(1), the claims against Abney should be dismissed. No action in this regard need be taken, however, given that—as a matter of law—*none* of the individuals are proper defendants here.

factor in the adverse action[.]" *Scheick v. Tecumseh Pub. Schs*, 766 F.3d 523, 529 (6th Cir. 2014) (citing *Gross*) (emphasis added). Rather, the plaintiff must show that age was **the "reason"** that the employer decided to act. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 350 (2013)(emphasis added.)

*Gross* made clear that the burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, "even when a plaintiff has produced some evidence that age was **one motivating factor** in that decision." *Id.* (quoting *Gross*, 557 U.S. at 180) (emphasis added); *see Geiger*, 579 F.3d at 621 ("*Gross* overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination."). However, "application of the *McDonnell Douglas*[23] evidentiary framework to prove ADEA claims based on circumstantial evidence remains consistent with *Gross*." *Scheick*, 766 F.3d at 529 (citations omitted).

As discussed below, the undersigned agrees with remaining Defendant Hamilton County Board of Commissioners that Anderson has not demonstrated a question of material fact regarding age discrimination under either the direct evidence path or the circumstantial evidence path.

Direct evidence is evidence "that proves the existence of a fact without requiring any inferences." *Id.* at 530 (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). After *Gross*, direct evidence is evidence that, if believed, "requires the conclusion that age was the 'but for' cause of the employment decision." *Id.* Statements must be made by decisionmakers to constitute evidence of discrimination. *Geiger*, 579 F.3d at 620–21 (citing *Rowan*). Other factors that may be

---

[23] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

considered are whether the statements were related to the decision-making process, whether they were more than vague, ambiguous or isolated remarks, and whether they were made close in time to the adverse employment action. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994)).

Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003) (en banc)). To set forth a prima facie case of age discrimination using circumstantial evidence, a plaintiff must establish the four elements of the iconic *McDonnell Douglas* test: 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position held; and 4) she was replaced by someone outside the protected class. *See id.* at 622. As an alternative to "replacement," a plaintiff may establish instead that a "comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992). The mandate to make a prima facie case "is not intended to be an onerous one." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Once a plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendant employer to come forward with a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citing *Geiger*). "The plaintiff then bears the burden of demonstrating that the proffered reason was in fact a pretext designed to conceal unlawful discrimination." *Id.* Pretext can be shown in one of three ways: by offering evidence that 1) the employer's stated reason

had no basis in fact; 2) the stated reason did not actually motivate the employer; or 3) the stated reason was insufficient to warrant the adverse employment action.  *Id.* (citing *Wexler*).

The Court will presume that the following excerpt from Plaintiff's first memorandum in opposition is intended by her to constitute direct evidence of age discrimination:

> **[Catherine] Gaines admitted To Anderson that their unit was referred to as the geriatric unit and that Denise Orchard was planning to dismantle the unit, hire younger workers, and go more clinical**.  The workers in Gaines unit was Over 55 years old. Gaines told Anderson that she was ordered by Orchard to provide a false statement about Anderson's conduct to lower Andersons performance evaluation.  Gaines refused to do so.  Defendants stated Gaines was fired for not doing her job and being too l lenient on Plaintiff's evaluation.  In 2010, Orchard's evaluates Anderson and gives Anderson 115.7% above the 100% level.  Gaines had been Plaintiff's supervisor since June 12, 2008.  Orchard would not permit Gaines to complete Anderson's evaluation for the year 2012. The unit was dismantled all the older black workers were terminated, A white woman was still there.  A young white male eventually moved out of state with his wife.

(Doc. 82 at PageID 3750 (emphasis added).)  Plaintiff is incorrect for a number of reasons.  A narrative in a brief is not the equivalent of testimony.  And even if it were testimony, it would be inadmissible hearsay testimony, *see* Fed. R. Evid. 801(c)(2), as it would be offered for the truth of the matter asserted in the statement.  *Sperle v. Mich. Dep't of Corrections*, 297 F.3d 483, 495–96 (6th Cir. 2002) (district court did not err in granting summary judgment, because "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact"); *see* Fed. R. Civ. P. 56(c)(2).  Supposing, somehow, it fit within a hearsay exception, *see* Fed. R. Evid. 801(d)(2), Plaintiff does not indicate *when* Gaines

heard Orchard's alleged statement, foreclosing any analysis of whether it was made in proximity to Plaintiff's removal. Moreover, a purported plan to "go more clinical" is not a "proxy" for age. *Scheick*, 766 F.3d at 531 (superintendent's statement that school board wanted principal to "retire" was not direct evidence of age discrimination, because it "would require an inference to conclude that retirement was a proxy for age (as opposed to either years of service or a desire that he leave the position voluntarily)").

Analysis of Plaintiff's claim under the circumstantial evidence path, therefore, is her single option. Defendant concedes that Plaintiff was at least 40-year-old and that she suffered an adverse employment action, two of the four elements necessary to establish a prima facie case and shift the burden of production. (Doc. 78 at PageID 3255.) Defendant disputes, however, that Plaintiff was otherwise qualified for her position or that she was replaced by—or treated differently than—a younger person.

Concerning the qualification prong, Defendant maintains that Plaintiff was removed "precisely because she was not qualified for the position of Children's Services Worker, and she was not doing her job well enough to meet HCJFS's legitimate expectations and that her incompetence created a risk of harm for the children on her caseload." (Doc. 78 at PageID 3256.) While it is true that Plaintiff's progressive discipline centered exclusively on poor performance, the Court remains mindful of the Sixth Circuit's warning not to conflate the qualification prong with the employer's proffered reason for terminating the employee's employment. *Loyd*, 766 F.3d at 590 ("We have repeatedly cautioned district courts against 'consider[ing] the employer's alleged nondiscriminatory reason when analyzing the prima facie case.'") (quoting *Wexler*, 317 F.3d at 574). Since her return to work in 2008, Plaintiff had been favorably

reviewed by Catherine Gaines[24] and Denise Orchard, although Orchard's review for 2010 was based primarily on Plaintiff's self-evaluation. When Monique Mays assumed supervision after Bill Abney's demotion, she testified that, at least initially, she and Plaintiff had a "very good working relationship."[25] (Mays Decl., Doc. 80 at PageID 3646 (¶ 4).) And while Deana Coddington was consistently critical of Plaintiff's performance, Karen Rumsey—who assumed Plaintiff's supervision when Coddington went on maternity leave—testified that she was aware that Plaintiff had been disciplined prior to her supervision, "but I was determined to give Ms. Anderson a clean slate." (Rumsey Decl., Doc. 80 at PageID 3717 (¶ 6).) For purposes of evaluating the instant Motion, therefore, and solely with regard to establishing a prima facie case, the undersigned concludes that Plaintiff was qualified for the position of Children's Services Worker.

The fourth element, however, clearly is problematic for Plaintiff. She offers no proof that she was replaced by a younger person, or that a similarly-situated younger person with comparable performance issues was treated more favorably. Summary judgment in favor of Defendant, accordingly, is warranted.

Assuming Plaintiff had established a prima facie case, HCJFS has produced substantial evidence that the progressive discipline imposed, culminating in removal, was based on legitimate, non-discriminatory reasons. Plaintiff's October 13, 2011 Written Reprimand came six months after Monique Mays became her supervisor. Mays and her supervisor, Scott Boone, initially were concerned that Plaintiff was "going through some type of break down." When her behavior was described to Program

---

[24] Gaines was terminated because of her poor managerial skills, and hence the integrity of her performance reviews of her direct reports may be questioned. Nonetheless, Plaintiff rightfully claims favorable reviews from Gaines.
[25] Mays presented Plaintiff with a "Certificate of Appreciation" on May 19, 2011 with the inscription, "We couldn't do it without you!" (Doc. 83-1 at PageID 3875.)

Compliance Administrator Wallis, "corrective action" was suggested. A few months later, a SAR facilitator sent a detailed email to Mays listing out nine very specific deficiencies regarding the Y.D. case. Then came the incidents detailed in the Written Reprimand concerning a failure to report for work (apparently also referred to as "AWOL status"); a number of shortcomings regarding the T.N. family; general unpreparedness for home visits, meetings and court hearings; and shortcomings regarding the S.P. family vis-à-vis court filings. Plaintiff filed a grievance in response to the Written Reprimand, which—after a Peer Review Hearing attended by a member of management and *two* members of the bargaining unit—was upheld.

Plaintiff's February 11, 2013 Suspension occurred under the watch of Deana Coddingham and Denise Orchard. Matters overlooked by Gaines were uncovered by Orchard, and Coddington was displeased with Plaintiff's "poor attitude." In advance of noticing a pre-disciplinary conference, Human Resources and management held a meeting with Plaintiff and her Union Steward to discuss Orchard's six-page spreadsheet that detailed Anderson's deficient job performance regarding 11 different cases. Not satisfied with Plaintiff's excuse that she had "several different supervisors and too many cases," Coddington proceeded with formal discipline as outlined in the collective bargaining agreement. Plaintiff was given the option to transfer into a different position—in lieu of granting her requested accommodation of a "reduced case load"— but she declined.[26] By the time the Pre-Disciplinary Conference was held, Plaintiff was accused of being AWOL again. Plaintiff again was represented by Binford and accorded due process protections. A neutral hearing officer found the numerous

---

[26] *See* Anderson Dep., Doc. 76 at PageID 521–22 (73:2–74:11).

allegations of misconduct to be valid, and Plaintiff consequently served an 80-hour suspension.

Plaintiff's July 23, 2013 Removal occurred after a second Pre-Disciplinary Conference that concerned matters "following the prior imposition of disciplinary actions (specifically, the ten-day suspension)." (Doc. 77-6 at PageID 3205.) HCJFS presented a list of six cases in which Plaintiff was deficient, one that prompted a magistrate to extraordinarily so note in a docket entry. Although Plaintiff had not been given a "reduced case load" as an ADA accommodation, as a practical matter her case load intentionally had been reduced by her supervisors to allow for a performance improvement. Still, "[b]y all accounts (including her own admission), the employee struggled to meet job expectations and was unable to keep up with job duties at the level of her peers[.]" (*Id.* at PageID 3206.) Eleven single-spaced pages later, the neutral hearing officer concluded that HCJFS's recommendation for discipline was "warranted." (*Id.* at PageID 3207.)

During her deposition, Plaintiff speculated that the events that preceded Boone's decision to issue the Written Reprimand—the first in the chain of progression—grew out of his anger over the fact that Bill Abney had been demoted:

> Q. Would you agree with me that your experience was that Denise Orchard became more critical of your performance after [C]atherine Gaines went out and you were under Deana and Karen Rumsey and Monique?
>
> A. Well, it became critical when Bill Abney was demoted. I think that's what started the criticisms, after he was the demoted, when they felt like I should have been with him. But he was my Supervisor giving me directives, and he was a Supervisor demoted to Caseworker.

And so that's when – I didn't realize it until after he had left that I had gone under Deana Coddington that they started keeping paper trails on me.  And I didn't understand it. I didn't realize what was going on.  But that's really how things just took a turn for the worst, and I didn't even know it.

. . . .

About the time [Bill Abney] was my Supervisor, we did a case together, but he didn't know the case, and the Court ordered us to do some home visits on the case, but he took over the case.  So he was telling the family what he was going to do, and hadn't consulted with me.  That's where we ran into problems, that he took over the caseload and he was scheduling appointments, and it just basically very chaotic.

. . . .

Q. And then I guess your perspective is people were mad that they had to demote him?

A. Yes.

Q. Somebody got mad because they had to demote him?

A. Yeah, that was –

Q. And who got mad because they had to demote him?

A. Scott Boone said that he was pissed off.

Q. Pissed off about what?

A. About his demotion, because he thought like I should have been. Erica – what is Erica – Binford?

Q. Yes.

A. We had meetings.  He met with us.  And this was prior to the pre-disciplinary hearing that we met.  And in one of the hearings, the meetings, he expressed that he was mad because he felt I should have been demoted.

Q. He was mad, you say, because you should have been demoted along with Bill Abney?

A. Yeah, but I'm operating under his – what he's telling me to do. I couldn't override it. I might not agree with anything Bill did, his supervision, but I still – you know, I couldn't make those decisions and that's the problem.

(Doc. 76 at PageID 497–98 (49:17–50:8), 604 (56:10–17), 509–10 (61:20–62:21); *see also id.* at PageID 642 (194:7–18).) Unfortunately for Plaintiff, however, *nothing about this testimony*, which the Court credits as true for purposes of deciding this Motion, *relates to age*. Thus, it is not probative of her allegations of discrimination.[27] Nor would it be probative of pretext as to the Pre-Disciplinary Conferences that led to Plaintiff's termination, in which Boone played no role. (Boone Decl., Doc. 80 at PageID 3641–42 (¶¶ 55–57).)

Plaintiff introduces no other evidence of pretext. HCJFS' stated reason of chronic and significant poor performance obviously had a basis in fact, and, under the applicable collective bargaining agreement applying progressive discipline, was sufficient to warrant termination. If not, surely the union representing Plaintiff would have proceeded to arbitration. Yet even if the reason was untrue or inadequate, Defendant urges that HCJFS nonetheless would be entitled to the "honest-belief rule," which allows a grant of summary judgment on pretext "even if [the employer's] conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Loyd*, 766 F.3d at 590–91 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009)). "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (employer need not demonstrate that its investigation was "optimal or that it left no stone unturned").) Here, the decision to terminate Plaintiff was made by Director

---

[27] Plaintiff's testimony fails to acknowledge the fact that Abney himself suggested demotion in lieu of discipline.

Moira Weir at the recommendation of Section Chief Denise Orchard following a nearly two-year period of progressive discipline and in reliance on the decisions of a Peer Review Panel and two neutral hearing officers. The undersigned agrees that Plaintiff cannot defeat the honest belief rule by her self-serving statements within her memoranda in opposition that re-litigate the specific instances of misconduct substantiating the numerous charges against her.

This Court is called upon now to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Plaintiff has not shown that age was even *a, much less the,* motivating factor in her removal. With the record evidence so one-sided in HCJFS' favor, remaining Defendant Hamilton County Board of Commissioners is entitled to judgment as a matter of law with respect to Plaintiff Jermain Anderson's federal claim of age discrimination.

### 2. Remaining Defendant Hamilton County Board of Commissioners is Entitled to Judgment as a Matter of Law with Respect to Plaintiff's Federal (Count Two) and State (Count Three) Claims of Retaliation

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . **because** he has opposed any practice made [unlawful by Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (emphasis added).[28] As with status discrimination, a plaintiff may establish Title VII retaliation "either by introducing direct evidence of

---

[28] In contrast, "[a]n employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Nassar*, *supra*, 570 U.S. at 343. "Status-based" discrimination refers to discrimination based on personal characteristics—that is, race, color, religion, sex, and national origin. *Id.* at 347.

retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008)).

Ohio Revised Code § 4112.02(I) similarly provides that it is unlawful "[f]or any person to discriminate in any manner against any other person **because** that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." (Emphasis added.) This language "mirrors" that of Title VII, and, consequently, "Ohio courts have held that '[f]ederal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Rev. Code § 4112.02(I)." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. The Buschman Co.*, 127 Ohio App. 3d 561, 713 N.E.2d 487, 491–92 (Ohio App. 12th Dist. 1998)). Thus, Anderson's federal and state claims of retaliation rise or fall together.

As earlier recited, Plaintiff filed an EEOC charge on November 20, 2012, which she amended on March 13, 2013.[29] She also filed a charge on July 24, 2013, the day *after* she was removed as a Children's Services Worker and obviously no longer employed by HCJFS. The November 20, 2012 charge was filed in the wake of a meeting held October 9 at which Biersack and Coddington asked Plaintiff, accompanied by Chief Union Steward Binford, to account for her deficient performance regarding 11 different cases. Not satisfied with her explanation that she "had several different supervisors and too many cases," management triggered the formal discipline process

---

[29] Plaintiff's 2004 dual-filed charge, which preceded her return to work in 2008, plays no role in the Court's analysis with regard to her 2013 termination.

by issuing on October 13 a Notice of Pre-Disciplinary Conference for the following November 8. That Conference was postponed at the request of Binford. A week later, Plaintiff left Karen Rumsey (filling in for Coddington, now on maternity leave) a phone message that her doctor was placing her on "bed rest" until November 26. Despite this medical restriction, Plaintiff nevertheless was able to file an EEOC charge on November 20, alleging age and disability discrimination and retaliation. Plaintiff's Pre-Disciplinary Conference eventually was held on January 10, with the added charge that Plaintiff failed to show up for work on December 26, the day after Christmas. After an evidentiary hearing, the allegations of misconduct against Plaintiff were found to be valid, and she was suspended for two weeks (February 14–27, 2013). Approximately two weeks after her return to work, on March 13, 2013, Plaintiff amended her November 20 EEOC charge to include discrimination based on race. A right-to-sue letter quickly followed on March 27.

As it did with respect to her claim of age discrimination, the Court will presume that the following excerpt from Plaintiff's first memorandum in opposition is intended by her to constitute direct evidence of retaliation:

> On 11/28/12, after Plaintiff returned from medical leave, Karen Rumsey admitted to Plaintiff that she would be receiving A poor performance evaluation. Orchard wanted Rumsey to lower Plaintiff's evaluation but Rumsey said she couldn't do it but later Found the courage to make false statements in Plaintiff's evaluation. When Plaintiff challenged the assessment of her Work performance, Rumsey stated that her hands were tied. **Rumsey also stated, that these actions were taken in response to Anderson Filing charges with the EEOC.**

(Doc. 82 at PageID 3758–59 (emphasis added).) Again, however, Plaintiff's narrative in a brief is not the equivalent of testimony. The only testimony before the Court on this

specific point comes from Karen Rumsey herself, who states, "I had no awareness at any time before, during or after my supervision of Ms. Anderson that she filed any sort of complain (sic) with the Equal Employment Opportunity Commission." (Rumsey Decl, Doc. 80 at PageID 3726 (¶ 30).) Thus, as Plaintiff has offered no direct evidence of retaliation, the undersigned will consider whether she advances a sufficient circumstantial case for retaliation.

Once more the Court turns to the *McDonnell Douglas* evidentiary framework used to assess claims of discrimination. *Imwalle*, 515 F.3d at 544. At the prima facie stage, Plaintiff must show that: (1) she engaged in a protected activity under Title VII; (2) HCJFS knew it; (3) HCJFS thereafter took an adverse employment action against her; and (4) there was a causal connection between the adverse employment action and her protected activity. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–96 (6th Cir. 2009). If Plaintiff establishes her prima facie case, of course, the burden of production shifts to HCJFS to articulate a legitimate nondiscriminatory reason for its adverse employment action. *Hunter,* 565 F.3d at 996. Once it does, Plaintiff then must show that HCJFS's reason is a pretext for retaliation. *Id.* She can do so by proving that the reason: (1) had no basis in fact; (2) did not actually motivate HCJFS; or (3) was not sufficient to warrant termination. *McCowen v. Village of Lincoln Heights*, 624 F. App'x 380, 383 (6th Cir. 2015) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007)).

A plaintiff making a Title VII retaliation claim must establish that her protected activity was "a but-for cause of the alleged adverse action by the employer." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Nassar*, 570

U.S. at 362); *see also Smith v. Ohio Dep't of Pub. Safety*, 997 N.E.2d 597, at ¶ 59 (Ohio App. 10th Dist. 2013) (adopting *Nassar*'s but-for causation standard for claims under Ohio retaliation law). In this civil action, it means that Plaintiff must present evidence from which a reasonable jury could find that HCJFS would not have fired her when it did if she had not filed her EEOC charge on November 20, 2012 or amended it on March 13, 2013.  *See EEOC v. Ford Motor Co.*, *supra*, 782 F.3d at 770.

Plaintiff clearly engaged in protected activity when she filed, and later amended, her EEOC charge.  And various HCJFS staff members had knowledge of her charge because they were involved in crafting the agency's response.[30]  HCJFS, of course, does not dispute that Plaintiff suffered two adverse employment actions when she was suspended without pay for 80 hours and later removed from her position as a Children's Services Worker.  But HCJFS forcefully—and successfully—disputes that there was a causal connection between Plaintiff's exercise of her protected right to file an EEOC charge and the progressive discipline meted out.

Plaintiff's sole evidence of causation appears to be the temporal proximity between her original EEOC charge filed on November 20, 2012 and her 80-hour suspension imposed the following February and between her amendment to that charge on March 13, 2013 and her removal the following July.  A precise review of the facts, however, show a pattern that Plaintiff strategically filed her original claim with the EEOC, and then amended it, *in reaction to* her managers' criticism of her performance, and not the other way around.  This circumstance is *not* evidence of causation.  As the Sixth Circuit noted recently:

---

[30] The staff members "who had involvement" with putting together HCJFS's position statement were Denise Orchard, Carolyn Wallis, Erica Binford, Chris Biersack, Julian Wagner, and Deana Coddington. (Doc. 76-3 at PageID 1285.)

The Supreme Court has expressed a concern that employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated. *See Nassar*, 133 S.Ct. at 2532 ("[A]n employee who knows that he or she is about to be fired for poor performance, …. [t]o forestall that lawful action, … might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation."); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality.").

*Montell*, 757 F.3d at 507. The foundation to Plaintiff's 80-hour suspension was laid as early as September 21, 2012, when Anderson "exhibited a poor attitude" with Deana Coddington, her new supervisor after Catherine Gaines went out again on medical leave in July. Coddington's supervisor, Section Chief Denise Orchard, emailed Chris Biersack in Human Relations a week later asking for a meeting to discuss discipline. That meeting occurred on October 9, 2012 when Plaintiff and her Union Steward were presented with a six-page spreadsheet detailing deficiencies across 11 different cases. Plaintiff offered no legitimate excuse, so three days later, on October 12, 2012, Biersack sent Plaintiff a Notice of Pre-Disciplinary Conference that was to have taken place the following November 8. Concomitantly, Biersack worked with Binford in an abortive attempt to persuade Plaintiff to take a different job in which a "reduced case load" could be accommodated. The November 8 Conference was postponed the day before, continued at Binford's request. A week later, Plaintiff left a voice mail message for Karen Rumsey, who became her supervisor when Coddington left for a maternity leave, that her doctor had placed her on "bed rest" through November 26, 2012. Plaintiff filed

her EEOC charge in this time band. Eventually the Conference was held on January 10, 2013, with the suspension notice to follow on February 11. Applying *Montell*, when an employer "proceed[s] along lines previously contemplated," the temporal proximity of the adverse employment action must *not* be taken "as evidence of causality." *Id.* (citing *Breeden,* and noting, "[W]e faithfully follow the Supreme Court's instructions from *Breeden.*"). Here, HCJFS already had notified Plaintiff of the disciplinary charges against her. That the hearing itself had been postponed—at her Union Steward's request no less—does not later permit an inference of causation when that hearing was rescheduled for after she filed her charge. *Id.* at 507. ("**We must analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated. If it does, then temporal proximity is not evidence of causality**, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation.") (emphasis added).

The timing around Plaintiff amending her EEOC charge requires the same conclusion. Plaintiff amended her charge within two weeks of serving her 80-hour suspension. Plaintiff's amendment, though, added only a claim of discrimination based on race to the same fact pattern, and a right-to-sue letter promptly followed. HCJFS scheduled and held a second Pre-Disciplinary Conference on July 1, 2013 concerning performance issues that had arisen post-suspension. A neutral hearing officer concluded on July 17, 2013 that HCJFS's recommendation of discipline was warranted, and, on July 22, 2013, Plaintiff was told that her removal was effective the next day.

More than four months obviously had passed since she amended her November 20, 2012 EEOC charge on March 13, 2013, and Plaintiff offers no other evidence of retaliatory conduct to establish causality. Thus she has failed to establish causation for purposes of her prima facie showing. *See Adamov v. U.S. Bank Nat'l Ass'n*, 681 Fed. App'x 473, 478 (6th Cir. 2017) (""[W]e have previously held that being 'discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation' on its own[.]") (quoting *Cooper v. City of N. Olmsted*, 795 F.2d 1295, 1272–73 (6th Cir. 1986).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And in retaliation cases, a plaintiff must establish that her protected activity, here, the filing—and later amending—an EEOC charge "was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. Plaintiff Jermain Anderson has not met this burden.

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323–24. The moving party need not support its motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex*). HCJFS has done just that. Remaining Defendant Hamilton County Board of Commissioner, therefore, is entitled to judgment as a matter of law with respect to Plaintiff's federal and state claims of retaliation.

## IV.    CONCLUSION

Consistent with the foregoing analysis, **IT IS RECOMMENDED THAT** the Motion to Dismiss and Motion for Summary Judgment by all Defendants in all Capacities Sued (Doc. 78) be **GRANTED** and that this civil action be **TERMINATED** from the Court's docket.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JERMAIN ANDERSON,                                    Case No. 1:13-cv-755

        Plaintiff,                                    Dlott, J.
                                                      Bowman, M.J.

    v.

HAMILTON COUNTY BOARD OF
COMMISSIONERS, *et al.*,

        Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendations ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).